**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA

        Plaintiff,

           v.                         CRIMINAL NO.: 22-433 (ADC)

CHRISTIAN M. ORTIZ,

        Defendant.

**REPORT & RECOMMENDATION**

## I.    PROCEDURAL BACKGROUND

On October 5, 2022, a grand jury returned an indictment against Christian M. Ortiz ("Defendant") charging him with prohibited possession of ammunition in violation of 18 U.S.C. § 922(g)(1). ECF No. 1 at 1. Pending before the court is Defendant's motion to suppress to which the United States of America ("the Government") subsequently filed a response in opposition. ECF Nos. 19, 24. Defendant seeks to suppress physical evidence secured from inside his residence and vehicle parked at his residence, arguing his Fourth Amendment right was violated. ECF No. 19 at 1–2. For the reasons set forth below, Defendant's motion to suppress should be DENIED.

On August 28, 2023, a hearing was held where the parties, among other things, notified the court that the Government was raising the issue of standing as to items found in a gray, 1999 Toyota Corolla, license plate number DIL 870 (the "1999 Toyota Corolla").[1] ECF No. 31. On November 16, 2023, Defendant filed a supplementary motion with a declaration made under penalty of perjury from Defendant's mother indicating that she was the owner of the 1999 Toyota

---

[1] There are two gray Toyota Corollas in this case. To avoid confusion, the parties stipulated to the years of each one at the beginning of the hearing. Hr'g, November 17, 2023, at 9:22 a.m.

Corolla and that at all relevant times, Defendant had her permission to use that vehicle. ECF No. 36-1 at 1. The subsequent suppression hearing was held on November 17, 2023, and in light of Defendant's supplementary motion filed the day before, the Government advised that they were no longer contesting Defendant's standing in the 1999 Toyota Corolla.

## II.    FACTUAL BACKGROUND

On March 26, 2014, an amended judgment against Defendant was entered for a violation to 18 U.S.C. §§ 922(g)(1) and 924(a)(2) for prohibited possession of a firearm, receiving thirty months in prison followed by three years of supervised release. ECF No. 66 at 1–2 in Case No. 12-86(ADC). In an unrelated case, on August 19, 2019, a second amended judgment was entered against Defendant for a violation of 21 U.S.C. §§ 841(a)(1), 846, and 860 for conspiracy to possess with intent to distribute at least 3.5 kilograms but less than 5 kilograms of cocaine within 1,000 feet of a protected location. ECF No. 4703 at 1 in Case No. 13-534(ADC). Under this sentence, Defendant received a term of imprisonment for 97 months to be served concurrently with his March 2014 sentence and eight years of supervised release. ECF No. 4703 at 2–3 in Case No. 13-534(ADC). As of September 26, 2022, Defendant was on supervised release under the supervision of United States Probation Officer George L. Maymí Meléndez ("USPO Maymí"). ECF Nos. 73 in Case No. 12-86(ADC); 5462 in Case No. 13-534(ADC).

On September 26, 2022, USPO Maymí received a phone call from Agent Morales of the Puerto Rico Police Bureau (the "PRPB") indicating that the PRPB was investigating a shooting resulting in death at a gas station located in Caguas, Puerto Rico and that, based on video surveillance footage on the scene, Defendant was a person of interest. After the phone call, Agent Morales sent a photo of the person of interest to USPO Maymí, and USPO Maymí replied, "It looks a lot like" Defendant. ECF No. 39-1 at 1, 3. Afterward, Senior USPO Luis Santana, USPO

Maymí's supervisor, sent USPO Maymí another photo and video footage[2] from the Caguas gas

station, depicting the events that led to the victim's demise. ECF No. 39-2 at 1; Hr'g, November

17, 2023, at 9:52–9:58 a.m.

The video recording, which recorded the events on September 26, 2022, at 12:02 a.m.,

depicts a gray, modern Toyota Corolla (the "2021 Toyota Corolla") pulling up into the Caguas gas

station followed by the 1999 Toyota Corolla. The 2021 Toyota Corolla pulls forward into a gas

pump while the 1999 Toyota Corolla parks away from the station's gas pumps. Thereafter the

footage shows Defendant, wearing a white Nike t-shirt, exit the 2021 Toyota Corolla. After six

seconds, Defendant walks outside of the camera's footage; however, approximately thirty seconds

later, a man and Defendant reappear. The video footage shows the man trying to evade Defendant

in the direction of the parked, 2021 Toyota Corolla. As Defendant chases the man and reaches the

2021 Toyota Corolla, he opens the driver side door of the vehicle to retrieve a weapon.

Afterwards, Defendant, with a weapon in hand, fires multiple rounds in the direction of which the

man was running. As the weapon fires, multiple projectiles exit the weapon rapidly, indicating that

the weapon had the capacity of firing more than one shot with a single pull of the trigger. Soon

after firing shots, Defendant is seen striking a woman in the neck with the same weapon. The

video footage concludes with Defendant reentering the 2021 Toyota Corolla, which leaves the

scene followed by the 1999 Toyota Corolla. Exhibit III.

USPO Maymí testified that he observed the video multiple times and started working with

his supervisors to seek the approvals necessary to activate the search and seizure special condition

under the terms of Defendant's supervised release. Additionally, USPO Maymí filed motions with

this court in cases 12-86(ADC) and 13-534(ADC), notifying the violations of Defendant's

---

[2] The video footage received by USPO Maymí was a recording of the video surveillance recording taken at the Caguas gas station. *See* Exhibit III. In other words, USPO Maymí did not view the original recording from the gas station.

supervised release and requesting an arrest warrant and a show cause hearing. ECF Nos. 73 in

Case No. 12-86(ADC); 5462 in Case No. 13-534(ADC). USPO Maymí explained that an exigent

search request triggered by violations of supervised released requires multiple approvals beyond

his own discretion. *See* ECF No. 39-3. Eventually, the exigent search request was approved, and

an arrest warrant was requested to and issued by the court. Hr'g, November 17, 2023, at 10:34–

10:40 a.m.

Upon approval, USPO Maymí collaborated with search team members of the USPO (the

"USPO search team"), the U.S. Marshals Service, and the local authorities to execute the arrest

warrant and exigent search. However, Defendant had already been arrested away from his home

during a stop by local authorities before USPO Maymí and his team mobilized. Thereafter, USPO

Maymí and his team went to the location of Defendant's arrest. Upon their arrival, Defendant was

detained in a police vehicle where USPO Maymí explained to Defendant why he was being

arrested and that his supervised release search condition was being enforced. During this

exchange, Defendant explained where the keys to his residence were, along with the keys to both

Toyota Corolla's parked at his home. USPO Maymí and his team then left the scene to execute the

search of Defendant's residence. Hr'g, November 17, 2023, at 10:40–10:45 a.m.

After USPO Maymí and his team reached Defendant's home and the U.S. Marshals

Service secured the area, the USPO search team and the PRPB K-9 Unit entered the residence.

USPO Maymí explained that the USPO search team led the search efforts, and in the event they

found contraband or anything incriminating, they would immediately notify USPO Maymí before

moving evidence. Inside the residence, USPO Maymí and his team seized (1) clothes resembling

what Defendant was wearing in the video footage: (a) a white Nike t-shirt, (b) blue jeans, (c) white

sneakers; (2) cash; (3) a notepad; and (4) sticker labels. Next, the USPO search team moved

outside to search both Toyota Corolla's that were parked on Defendant's driveway, immediately

adjacent to the residence's entrance. ECF Nos. 39-7–8. First, the USPO search team searched the

2021 Toyota Corolla, finding nothing. Second, the USPO search team searched the 1999 Toyota

Corolla and seized (1) one magazine with 17 rounds of ammunition, (2) identification cards of

Defendant, (3) cash, (4) one wallet, (5) two bags, and (6) one cell phone. Hr'g, November 17,

2023, at 10:45 a.m., 10:47–10:57 a.m., 11:43–11:48 a.m.; ECF Nos. 39-6, 39-9.

III.    **ANALYSIS**

Defendant contends that his Fourth Amendment rights were violated on three grounds.

First, USPO Maymí did not have reasonable suspicion to believe that Defendant was violating his

supervised release terms. ECF No. 19 at 8. Second, the USPO Maymí was an agent of the PRPB

under the "stalking horse" theory. ECF No. 17–18. Third, USPO Maymí's search was not

reasonable because once Defendant was arrested, he was no longer a threat to public safety, nor

could he destroy evidence. ECF No. 19 at 16. The Government disagrees on all points. ECF No.

24 at 6–9.[3]

A.   **Whether USPO Maymí had reasonable suspicion to believe that Defendant was the man in the video footage committing crime.**

Defendant argues that USPO Maymí did not have reasonable suspicion to believe that

Defendant was the man in the gas station video. The Fourth Amendment protects the "right of the

people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures." *Davis v. United States*, 564 U.S. 229, 234–35 (2011). In analyzing reasonableness, a

search "conducted outside the judicial process, without prior approval by judge or magistrate, [is]

---

[3] Defendant does not contest the fact that at the time of the incident in question he was serving supervised release terms as a result of judgments entered against him in cases 12-86(ADC) and 13-534(ADC). Furthermore, USPO Maymí identified Defendant in open court as the individual in cases 12-86(ADC) and 13-534(ADC) under his supervision. Hr'g, November 17, 2023, at 9:50 a.m. Defendant signed his terms of supervised release in August 2019 and was explicitly briefed on the special search conditions before. Hr'g, November 17, 2023, at 11:40–11:42 a.m.

*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. at 338 (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967) (internal quotations omitted)). The law recognizes an exception to this requirement where the government has "special needs, beyond the normal need for law enforcement." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (quotation and internal quotation marks omitted). This exception applies to individuals, such as Defendant, who are serving a term of federal supervised release. *See id.* at 875.

A releasee's expectation of privacy is further diminished where he has consented to a search condition. *See United States v. Knights*, 534 U.S. 112, 118 (2001) (stating that the existence of a search condition is "a salient circumstance"). In light of these considerations, the Supreme Court has held that "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id.* at 121. Under such circumstances, the Fourth Amendment does not require the officer to obtain a warrant. *Id.* at 121–22.

While the Supreme Court in *Knights* was specifically addressing a probationer, the First Circuit has applied *Knights'* reasonable suspicion analysis to individuals on supervised releasee and held that supervised releasees and probationers have similar expectations of privacy. *See United States v. Stewart*, 532 F.3d 32, 36 (1st Cir. 2008) (recognizing that probation and supervised release are different forms of conditional release, and courts have not distinguished among conditional releasees for Fourth Amendment purposes); *United States v. Weikert*, 504 F.3d 1, 12 (1st Cir. 2007) (refusing to distinguish the privacy interests of a supervised releasee from a probationer). In evaluating whether an officer had reasonable suspicion to justify a search, courts

look to the "totality of the circumstances" to determine whether the officer had a "particularized and objective basis" to suspect the person searched of criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). A "mere hunch" is insufficient, but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274 (quotation and internal quotation marks omitted).

As of September 26, 2022, the date of the gas station shooting, Defendant was still on supervised release and subject to a special search condition:

> The defendant shall submit his person, property, house, vehicle, papers, computers (as defined in 18 U.S.C. Section 1030(e)(1)), other electronic communications or data storage devices or media, to a search conducted by a United States probation officer at a reasonable time and in a reasonable manner, *based upon reasonable suspicion of contraband or evidence of a violation of a condition of release*. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition.

ECF No. 4703 at 5 in Case No. 13-534(ADC) (emphasis added); *see also* ECF No. 66 at 4 in Case No. 12-86(ADC) (amended judgment). To activate these search conditions, the USPO needed reasonable suspicion that Defendant was the male shooter in the video and reasonable suspicion that Defendant was committing a violation of a condition of his release. It will first be addressed whether Defendant was the gas station shooter depicted in the video recording.

USPO Maymí had been Defendant's probation officer since 2019 and had seen Defendant at least 20 times since then. Therefore, USPO Maymí's familiarity with Defendant based on his experience supervising him made it that he could reasonably identify Defendant. During his testimony, USPO Maymí explained how the male shooter in the video recording of the events at the Caguas gas station had physical characteristics consistent with Defendant: body build, facial hair, hairstyle, and tattoos. Specifically, USPO Maymí testified that the shooter in the video had a

darker right arm than left arm, which reasonably led him believe that the right arm was clearly

marked. While the exact details of the markings were not evident based on the video, the markings

on the shooter's arm were consistent with Defendant's right arm that was completely covered in

tattoos. Hr'g, November 17, 2023, at 10:34–10:37 a.m.

      USPO Maymí further testified that he recognized the vehicles in the video and associated

them with Defendant because he personally had seen them before. USPO Maymí specifically

noted that Defendant had purchased the 2021 Toyota Corolla while working during his supervised

release term. Additionally, USPO Maymí knew that he had access to the 1999 Toyota Corolla

because it was his mother's, who had given him permission to drive it. While acknowledging that

Toyota Corollas are common vehicles, USPO Maymí testified how he associated these vehicles

with Defendant because of their distinct rims, heavily tinted windows, the 1999 Toyota Corolla's

spoiler, and the fact that the vehicles were seen arriving and leaving together in the gas station

video footage. USPO Maymí's testimony is credible because he had enough personal experience

with Defendant to reasonably identify him based on the video footage. Taking all the previously

mentioned details as a whole into account, the reasonable suspicion threshold has been satisfied.

Hr'g, November 17, 2023, at 10:22–10:25, 10:34–10:37 a.m.

      Defendant argues that USPO Maymí lacked certainty that Defendant was the man in the

video because USPO Maymí's chronological notes (ECF No. 39-10 at 1) and motions to the court

(ECF No. 73 at 2 in Case No. 12-86(ADC); ECF No. 5462 at 2 in Case No. 13-534(ADC) stated

that after viewing the video, he "preliminarily identified" Defendant. ECF No. 19 at 13. According

to Black Law's Dictionary, the term "preliminary" means "Coming before and usu[ally] leading

up to the main part of something happening before something that is more important, often in

preparation for it." Black's Law Dictionary (11th ed. 2019). With this context, the term

8

preliminarily identified could mean that the identification was made early in the investigation or made before USPO Maymí was certain that the man in the video was Defendant. USPO Maymí's testimony, however, is consistent with the former:

> Q [Defense Counsel] But the specific term you used in your chrono[logical notes] and in the motion you filed with the court was that you had made a preliminary identification.
>     . . .
> A [USPO Maymí] As stated before, the reason I used preliminary was because I was in the early onset of my investigation as to Defendant being in violation of his conditions of supervision. Nonetheless, *I was certain* that the person that I saw in the pictures that were provided to me [and after reviewing the video multiple times] . . . *the person that I saw was [Defendant].*

Hr'g, November 17, 2023, at 11:27–11:28 a.m. (emphasis added). Regardless, the reasonable suspicion standard does not require a positive identification with absolute certainty. *See New Jersey v. T.L.O.*, 469 U.S. 325, 346 (1985) ("But the requirement of reasonable suspicion is not a requirement of absolute certainty: 'sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment.'").

Since it has been determined that Defendant was the man shooting in the video recording, the only issue remaining is whether that video depicted Defendant violating his terms of release. According to Defendant's terms of supervised release, he "must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon." ECF No. 4703 at 4 in Case No. 13-534(ADC); *see also* ECF No. 66 at 3 in Case No. 12-86(ADC). In addition, while serving his supervised release terms, Defendant cannot commit any federal, state, or local crime. ECF No. 66 at 3 in Case No. 12-86 (ADC); ECF No. 4703 at 3 in Case No. 13-534(ADC). The video clearly shows Defendant in possession of a weapon and shooting it. Exhibit III at 1:01-1:09. Also, the video shows Defendant committing crimes, such as assaulting a woman at the gas station. Exhibit III at 1:06-1:08. Accordingly, USPO Maymí had reasonable suspicion to believe that

Defendant was the man in the video, committing violations of supervised release terms, and could therefore search Defendant and his property pursuant to the conditions of his supervised release.

**B.  Whether USPO Maymí was a stalking horse for the PRPB.**

Defendant next argues that USPO Maymí was a "stalking horse" for the PRPB, serving as an agent to unlawfully bypass the warrant requirement. ECF No. 19 at 18. "[P]robation and parole officers may not serve as 'stalking horses' for the police by initiating searches solely for police purposes in order to help police circumvent the fourth amendment's warrant requirements." *United States v. Giannetta*, 909 F.2d 571, 581 (1st Cir. 1990) (citing *United States v. Cardona*, 903 F.2d 60, 65–66 (1st Cir. 1990); *United States v. Jarrad*, 754 F.2d 1451, 1454 (9th Cir.), *cert. denied*, 474 U.S. 830 (1985)). "The mere presence of police during a probation search, however, does not transform the search into a police search." *Id.* (citing *United States v. Jeffers*, 573 F.2d 1074, 1075 (9th Cir. 1978) (per curiam)). "Nor is mutually beneficial cooperation between probation officers and other law enforcement officials precluded." *Id.* (citing *United States v. Consuelo–Gonzalez*, 521 F.2d 259, 267 (9th Cir. 1975) (en banc)).

Here, although USPO Maymí received information, photos, and video surveillance footage provided by the PRPB, USPO Maymí conducted his own investigation based on that evidence. *See id.* (holding that probation officer was not a "stalking horse" when he "energetically pursu[ed] his own investigation" even though police "cooperate[d] and were investigating, in part, the same suspected offenses"). No testimony was presented showing that PRPB officers led or motivated the search at Defendant's residence. To the contrary, USPO Maymí testified that he was responsible for the search and that the USPO search team were the only ones searching, and once

something was found, USPO Maymí was immediately notified. Hr'g, November 17, 2023, at 9:52–10:00 a.m., 11:37–11:40 a.m.[4]

Additionally, while both the PRPB and the U.S. Probation Office were investigating Defendant, their motivations were sufficiently distinct. On one hand, the PRPB was primarily concerned about solving the gas station homicide. USPO Maymí, on the other hand, was primarily concerned with determining whether his supervisee, Defendant, had violated the terms of his supervision and was a potential danger to public safety. Although the PRPB and the U.S. Probation Office cooperated to further their individual interests, that is not enough to conclude that USPO Maymí was a stalking horse for the PRPB. *See United States v. Scott*, 566 F.3d 242, 246 (1st Cir. 2009) ("We have long endorsed 'mutually beneficial cooperation' between law enforcement and probation officers. . . . Likewise, law enforcement officers may share relevant intelligence about a parolee's criminal activity with those parole officers responsible for his supervision.").

**C. Whether the search was reasonable.**

Defendant argues that the search violated the terms of his conditions and the Fourth Amendment because it was not done reasonably. Specifically, Defendant contends that once he was arrested, law enforcement could not search his residence because he was no longer a threat to public safety or could destroy evidence. ECF No. 19 at 16. "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Knights*, 534 U.S. at 118–19 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). As discussed above,

---

[4] Even though PRPB K-9 was present, this is not enough to bolster Defendant's stalking horse argument.

Defendant's supervised release conditions significantly diminished his reasonable expectation of privacy to further the purposes behind supervised release: "[]rehabilitation and protecting society from future criminal violations." *See id.* at 119.

Other circuits have persuasively addressed this issue before. In *United States v. Trujillo*, 404 F.3d 1238, 1240 (10th Cir. 2005), the Tenth Circuit addressed a similar issue where a defendant was paroled from a Utah State prison and signed an agreement permitting officers to conduct searches upon reasonable suspicion to ensure his compliance with parole conditions. The defendant eventually violated his parole, and a warrant was issued for his arrest. *Id.* Thereafter, police officers arrested the defendant near his residence while he was in his vehicle, parked in his driveway. *Id.* at 1241. After the arrest, police officers searched the defendant's home and found weapons and drug paraphernalia. *Id.* at 1240–41.

On appeal, the defendant argued that his arrest terminated the clause in his parole agreement allowing for searches of his residence on reasonable suspicion because, once he was arrested, the government's interests justifying the search were significantly weakened. *Id.* at 1241. The Tenth Circuit rejected this argument and held that the defendant's arrest did not "eliminate[] the government's interests in supervising parolees and protecting society from the harm posed by recidivism" *Id.* at 1243. In holding so, it determined that "the government has an ongoing interest in obtaining information about the scope and severity of [the parolee's criminal activity]" to help "determine whether and how to penalize the recidivist." *Id.* at 1243. The court further noted that even after the defendant was arrested, the government's "interest in protecting society from [the defendant's] return to crime remains a valid objective" because "contraband does not cease to be dangerous when law enforcement officers take a parolee into custody." *Id.* at 1244. Finally, the court concluded that the parolee's reduced privacy rights do not increase upon arrest, and "if

12

anything, [the defendant's] arrest further diminishe[d] any right from interference by law enforcement." *Id.* Thus, the Tenth Circuit determined a search soon after a parolee's arrest was valid, as a condition of the parole agreement, and that the parole agreement continued to be in force following the parolee's arrest. *Id.*

Likewise, in *United States v. Jones*, 152 F.3d 680 (7th Cir. 1998), the Seventh Circuit confronted an analogous situation. The defendant, who was on parole and subject to a warrantless search clause under state law, was arrested by the police a short distance away from his apartment, and a search of his residence afterward ensued. *Id.* at 683. The defendant argued that once the police took him into custody, there was no need to supervise him because he was under arrest, and while under arrest, he did not pose a continuing threat to society. *Id.* at 685. The Seventh Circuit rejected this argument for a number of reasons. Most persuasively, the court held that the fact of the defendant's arrest did not augment his diminished expectation of privacy and did not entirely curtail the societal risk posed by the contraband in his residence. *Id.* at 686. For example, the defendant's parole officer had reasonable grounds to believe that the defendant had drugs and weapons in his home, which the court noted was a threat to defendant's children that lived in the residence with him. *Id.* Consequently, the court held that the search clause of the probation regulation remained in effect, authorizing the warrantless search of the defendant's residence. *Id.* at 687.

Other circuits have also held the same way. *See United States v. Hill*, 967 F.2d 902 (3rd Cir. 1992) (determining that the interest in inspecting a parolee's business did not terminate upon arrest but intensified; thus, the warrantless search of the parolee's business *one day after his arrest* did not violate the Fourth Amendment); *Latta v. Fitzharris*, 521 F.2d 246 (9th Cir. 1975) (("[A] parole officer's interest in inspecting [a parolee's] place of residence did not terminate upon his

arrest; if anything, it intensified. Revocation is not a necessary consequence of a parole violation. . . .  In making their decision regarding disposition, the parole authorities need to know the number and seriousness of all violations, as well as other current information about the parolee's progress"); *United States v. Jackson*, 663 F. App'x 31, 33 (2d Cir. 2016) (upholding search of defendant's residence that happened after his arrest).

Here, Defendant was arrested in a Mitsubishi Outlander away from his residence. Afterward, USPO Maymí and his team conducted a search of the residence, the 2021 Toyota Corolla, and the 1999 Toyota Corolla. While Defendant was not arrested at the location of where the later search was conducted, Defendant's arrest did not eliminate the government's interest in his rehabilitation or public safety. First, "the evidence seized during the search bore directly upon his potential for rehabilitation[] and would figure prominently in decisions on the need for further incarceration." *Hill*, 967 F.2d at 911. However, to make this decision, USPO Maymí required evidence of supervised release violations. Hr'g, November 17, 2023, at 11:40–11:42 a.m.

Second, arresting Defendant did not eliminate the danger to public safety. Before the search, USPO Maymí had reason to believe that Defendant, at a minimum, was in possession of an automatic weapon, a weapon which was still dangerous even after Defendant was in custody. *See Trujillo*, 404 F.3d at 1244 ("[J]ust because the parolee is under arrest does not mean that the contraband ceases to pose a risk of harm to the general public."). This is even more so when the gas station video footage shows that Defendant was accompanied by at least one other individual who drove the 1999 Toyota Corolla—someone who could have reasonably had access to the weapon after Defendant's arrest. Accordingly, the search of Defendant's residence and the two vehicles parked at the residence, although occurring after his arrest, was grounded on reasonable suspicion and in accordance with his supervised release terms. Therefore, it is recommended all

14

items seized at Defendant's residence, to include those items found in the 1999 Toyota Corolla, not be suppressed.

**IV.**    **CONCLUSION**

For the foregoing reasons, Defendant's motion to suppress (ECF No. 19) should be DENIED. Accordingly, all the items seized at Defendant's residence, to include the items found in the 1999 Toyota Corolla, should not be suppressed. The parties have fourteen (14) days to file any objections to this report and recommendation unless otherwise ordered by the court. Failure to file the same within the specified time waives the right to object to this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); D.P.R. Civ. R. 72(d); *see also* 28 U.S.C. § 636(b)(1); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir. 1994); *United States v. Valencia*, 792 F.2d 4 (1st Cir. 1986).

IT IS SO RECOMMENDED.

In San Juan, Puerto Rico, this 28th day of December, 2023.

s/Marcos E. López
U.S. Magistrate Judge